# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| EASTLAKE LOFTS CONDOMINIUM ASSOCIATION, | DIVISION ONE |
| Plaintiff, | No. 78266-5-I (consol. with No. 78267-3-I) |
| v. | UNPUBLISHED OPINION |
| KEVIN M. HOOVER and JANE DOE HOOVER, husband and wife, and their marital community; WILMINGTON TRUST, N.A., as successor trustee to CITIBANK, N.A., as Trustee for Certificate Holders of Structured Asset Mortgage Investments II Trust 2007-AR5, Mortgage Pass Through Certificates, Series 2007 AR-5, | |
| Respondents, | |
| THE CONDO GROUP, LLC; EASTLAKE LOFTS 205 LLC, a Washington limited liability company; LAKEWOOD COMMONS 234 LLC, a Washington limited liability company; UMPQUA BANK, a bank organized under the laws of Oregon; DELNA LIAN JACOBS, an individual residing in California; CHRISTINA JACOBS SPITZ, an individual residing in California and the Executor of the ESTATE OF HAROLD LIAN; MAYNARD GROSS, an individual residing in California; unknown heirs of CARL ELLING LIAN; WE TRUST COMPANY, a Washington company; | FILED: July 29, 2019 |
| Appellants. | |

DWYER, J. — In 2011, Eastlake Lofts Condominium Association foreclosed on a condominium owned by Kevin Hoover without properly serving process on CitiBank, a junior lienholder. The Condo Group, LLC purchased the condominium at a sheriff's sale and, in 2013, sold it to Carl Lian, who financed his purchase with a loan from Umpqua Bank. Lian later died. In 2016, CitiBank successfully moved to vacate the original foreclosure judgment as against its interest. Wilmington Trust, N.A., the successor in interest to CitiBank, then sought to foreclose on its existing lien, adding The Condo Group, LLC, Lian's heirs, and Umpqua Bank as third party defendants. The case is before us on appeal from the trial court's grant of summary judgment to Wilmington. Because the evidence of record gives rise to competing inferences as to the applicability of equitable defenses to the foreclosure action, summary judgment was improper. Accordingly, we reverse.

I

In 2007, Kevin Hoover purchased a condominium in the Eastlake Lofts development with the aid of a $358,950 loan from CitiBank, secured by a deed of trust. JPMorgan Chase Bank was the loan's original servicer. CitiBank's interest in the property was placed into a securitized mortgage trust for which CitiBank was a beneficiary, with Quality Loan Service Corporation (QLS) as trustee. In 2010, Hoover filed for chapter 7 bankruptcy protection and ceased paying dues to the Eastlake Lofts Condominium Association (the Association).

In July 2011, the Association commenced this action to foreclose its lien on the condominium. It named CitiBank as a defendant. Personal service of the

summons and complaint was not made on CitiBank in Washington but, rather, was made at an office in Sioux Falls, South Dakota. No affidavit was sworn and filed with the trial court to the effect that service on CitiBank could not have been made within Washington, as required by RCW 4.28.185(4).[1] After neither Hoover nor CitiBank made an appearance in the action, a default judgment and foreclosure decree was entered in favor of the Association.

A foreclosure sale took place in June 2012. The highest bidder, The Condo Group, LLC (Condo Group), purchased the condominium for the amount of the judgment debt, $20,100.[2] After the one-year redemption period expired, the King County Sheriff issued Condo Group a deed to the condominium identifying the $20,100 purchase price. Condo Group recorded this deed with the county auditor.

In October 2013, Condo Group sold the condominium to Carl Lian for $399,000 and conveyed a statutory warranty deed to him. Lian's purchase of the condominium was partially financed with a $100,000 loan from Sterling Savings (now Umpqua) Bank.

Stewart Title acted as the closing agent and title insurer for Lian and Umpqua in this transaction. Stewart Title had constructive knowledge of CitiBank's deed of trust on the condominium. However, neither Stewart, nor Umpqua, nor Lian made an inquiry as to whether CitiBank considered the deed of trust to be an active encumbrance against the condominium.

---

[1] RCW 4.28.185(4) states as follows: "Personal service outside the state shall be valid only when an affidavit is made and filed to the effect that service cannot be made within the state."

[2] At the time of the sale, the condominium was valued by the county assessor at $277,000.

In 2016, CitiBank, alleging improper service, moved to vacate the 2011 default judgment against it pursuant to CR 60(b)(5) for lack of personal jurisdiction. After hearing argument, the trial court granted CitiBank's motion and vacated the judgment against it. Subsequently, Wilmington acquired CitiBank's interest. Wilmington then answered the Association's 2011 complaint and asserted a foreclosure claim, naming Condo Group, Lian, and Umpqua as third party defendants. Lian died before he could be served. Wilmington's third party complaint was twice amended to designate Lian's known heirs as third party defendants. Lian's heirs, Umpqua, and Condo Group all opposed Wilmington's foreclosure request, asserting their entitlement to several equitable defenses or to bona fide purchaser protection.

The trial court granted partial summary judgment to Wilmington and entered a decree of foreclosure in its favor. This ruling also dismissed with prejudice Condo Group and Umpqua Bank's counterclaims against Wilmington. In a supplemental judgment, the trial court awarded Wilmington attorney fees and costs totaling $33,238.99. Condo Group, Lian's heirs, and Umpqua Bank appeal.[3]

II

"The de novo standard of review is used by an appellate court when reviewing all trial court rulings made in conjunction with a summary judgment motion." Folsom v. Burger King, 135 Wn.2d 658, 663, 958 P.2d 301 (1998). In

---

[3] Together, Lian's heirs and Umpqua Bank have submitted a single set of briefs, while Condo Group has submitted a separate set of briefs. To avoid confusion, we will refer to Lian's heirs and Umpqua Bank collectively as "Umpqua." However, Lian will be referred to as an individual where actions he took are being discussed.

reviewing a summary judgment order our inquiry is the same as the trial court's. Folsom, 135 Wn.2d at 663. Summary judgment is proper when all of the pleadings, affidavits, depositions, and admissions on file show "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). A material fact "'is a fact upon which the outcome of the litigation depends, in whole or in part.'" Lamon v. McDonnell Douglas Corp., 91 Wn.2d 345, 349, 588 P.2d 1346 (1979) (quoting Morris v. McNicol, 83 Wn.2d 491, 494-95, 519 P.2d 7 (1974)).

The party moving for summary judgment has the burden of showing that there is no genuine dispute as to any issue of material fact. Once that burden is met, the nonmoving party has the burden of producing evidence to show the existence of such an issue. Kahn v. Salerno, 90 Wn. App. 110, 117, 951 P.2d 321 (1998). All evidence must be considered in the light most favorable to the nonmoving party, and summary judgment may be granted only when a reasonable person could reach but one conclusion. Lamon, 91 Wn.2d at 349 (quoting Morris, 83 Wn.2d at 494-95).

As we have stated,

> "The object and function of summary judgment procedure is to avoid a useless trial. A trial is not useless, but is absolutely necessary where there is a genuine issue as to any material fact." Barber v. Bankers Life & Cas. Co., 81 Wn.2d 140, 144, 500 P.2d 88 (1972). "A material fact is one upon which the outcome of the litigation depends." Balise v. Underwood, 62 Wn.2d 195, 199, 381 P.2d 966 (1963). Importantly, "even if the basic facts are not in dispute, if the facts are subject to reasonable conflicting inferences, summary judgment is improper." Southside Tabernacle v. Pentecostal Church of God, 32 Wn. App. 814, 821, 650 P.2d 231 (1982). Indeed, "[s]ummary judgment procedures are not designed to resolve inferential disputes." Sanders v. Day, 2 Wn. App. 393,

398, 468 P.2d 452 (1970). "It seems obvious that in situations where, though evidentiary facts are not in dispute, different inferences may be drawn therefrom as to ultimate facts such as intent, . . . a summary judgment would not be warranted." Preston v. Duncan, 55 Wn.2d 678, 681-82, 349 P.2d 605 (1960); accord Weisert v. Univ. Hosp., 44 Wn. App. 167, 172, 721 P.2d 553 (1986).

Kelley v. Tonda, 198 Wn. App. 303, 310-11, 393 P.3d 824 (2017).

"[T]he question of whether equitable relief is appropriate is a question of law." Niemann v. Vaughn Cmty. Church, 154 Wn.2d 365, 374, 113 P.3d 463 (2005). Due to the discretionary nature of decisions made in equity, granting equitable relief on summary judgment may often be inappropriate. Cornish Coll. of the Arts v. 1000 Virginia Ltd. P'ship, 158 Wn. App. 203, 220, 242 P.3d 1 (2010). Equitable claims must be analyzed pursuant to the facts of each case to which a party seeks their application; even when a court "recognize[s] 'factors' to guide the court's determination of the equitable issues presented, these considerations are not exclusive, but are intended to reach all relevant evidence." Vasquez v. Hawthorne, 145 Wn.2d 103, 107-08, 33 P.3d 735 (2001). In other words, even when there is evidence satisfying all such "factors," equitable relief does not necessarily follow. Instead, "the focus remains on the equities involved between the parties." Vasquez, 145 Wn.2d at 107.

III

First among the sundry defenses asserted by Umpqua and Condo Group against Wilmington's efforts to foreclose is the doctrine of laches. Laches bars Wilmington's action, they assert, because Wilmington and CitiBank, collectively, unreasonably delayed the foreclosure action, and during the period of this delay,

6

the condominium's ownership situation changed to the extent that enforcement of the deed of trust would work an injustice. For its part, Wilmington denies that any delay was unreasonable and avers that the trial court was correct to dismiss this defense on summary judgment. Because the evidence of record gives rise to competing inferences as to the propriety of the asserted defense, trial court fact-finding is necessary.

Laches is an equitable defense that is based on estoppel.[4] Real Progress, Inc. v. City of Seattle, 91 Wn. App. 833, 843-44, 963 P.2d 890 (1998). The doctrine applies when a defendant affirmatively establishes "(1) knowledge by plaintiff of facts constituting a cause of action or a reasonable opportunity to discover such facts; (2) unreasonable delay by plaintiff in commencing an action; and (3) damage to defendant resulting from the delay in bringing the action." Davidson v. State, 116 Wn.2d 13, 25, 802 P.2d 1374 (1991). "To constitute laches there must not only be a delay in the assertion of a claim but also some change of condition must have occurred which would make it inequitable to enforce it." Waldrip v. Olympia Oyster Co., 40 Wn.2d 469, 477, 244 P.2d 273 (1952). "[W]hen asserted in opposition to the interest of a landowner, [laches] must be proved by clear and convincing evidence." Arnold v. Melani, 75 Wn.2d 143, 148, 449 P.2d 800, 450 P.2d 815 (1968). "Generally, laches depends upon

---

[4] "'Laches has been applied by Washington courts since 1894.'" Newport Yacht Basin Ass'n of Condo. Owners v. Supreme Nw., Inc., 168 Wn. App. 56, 77 n.17, 277 P.3d 18 (2012) (quoting Deane W. Minor, Recent Development, Hayden v. City of Port Townsend, 93 Wn.2d 870, 613 P.2d 1164 (1980), 56 WASH. L. REV. 549, 554 (1981) (citing Rigney v. Tacoma Light & Water Co., 9 Wash. 576, 38 P. 147 (1894)).

the particular facts and circumstances of each case." Lopp v. Peninsula Sch.

Dist. No. 401, 90 Wn.2d 754, 759, 585 P.2d 801 (1978).

> "A court of equity moves upon consideration of conscience, good faith and reasonable diligence. Knowledge and unreasonable delay are essential elements of the defense of laches. The precise time that may elapse between the act complained of as wrongful and the bringing of suit to prevent or correct the wrong does not, in itself, determine the question of laches. What constitutes unreasonable delay is a question of fact dependent largely upon the particular circumstances. No rigid rule has ever been laid down."

Stewart v. Johnston, 30 Wn.2d 925, 935-36, 195 P.2d 119 (1948) (quoting Fed.

United Corp. v. Havender, 24 Del. Ch. 318, 345, 11 A.2d 331 (1940)).

The chief element of laches in dispute before us is whether an unreasonable delay took place. Genuine issues of material fact exist regarding the reasonableness of CitiBank's, and its successor in interest Wilmington's, decisions not to pursue foreclosure at an earlier time. Condo Group and Umpqua contend that CitiBank, and later Wilmington, unreasonably delayed the commencement of foreclosure proceedings when CitiBank, purportedly aware of the default judgment in 2012, took no action to vacate that judgment until 2016, with no foreclosure proceeding being commenced by Wilmington until December of that year.[5]

---

[5] To the extent that the third party defendants dispute the validity of the trial court's vacation of the 2012 default judgment, they are wrong. They do not have standing to challenge this decision as they were not parties to the case at the time.

Nor was CitiBank required to give notice to any of the third party defendants of its motion to vacate. CR 60(e)(3) provides that a motion to vacate "shall be served upon all parties affected in the same manner as in the case of summons in a civil action." Only parties to the litigation must be served—the rule does not require that notice be given to every conceivable entity with an interest in the outcome of the litigation. Again, at the time the motion to vacate was brought, none of the third party defendants were parties to the case.

Condo Group analogizes CitiBank's and Wilmington's courses of action to that taken by a junior lienholder in Carlson v. Gibraltar Savings of Washington, 50 Wn. App. 424, 749 P.2d 697 (1988). The Carlsons, junior lienholders, saw their interest wiped out in a foreclosure sale by the senior lienholder and took no action to assert their interest when the borrower challenged the foreclosure. Carlson, 50 Wn. App. at 426, 431. More than three years after receiving notice of the foreclosure, they sued to invalidate the foreclosure sale and reinstate their lien. Carlson, 50 Wn. App. at 427. The court held that this suit was barred by laches, as the Carlsons had notice of the original foreclosure, and the "most charitable interpretation" of the undisputed facts was that they were waiting for their rights to be vindicated in the borrower's litigation rather than acting themselves. Carlson, 50 Wn. App. at 431.

In both the trial court and on appeal, Wilmington asserts that the delay was the result of events taking place outside the arena of litigation: First, in August 2013, after loan servicing responsibility was transferred from JPMorgan Chase Bank, N.A. to Select Portfolio Services (SPS), the latter determined that Chase had not sufficiently completed loss mitigation efforts with the borrower, and SPS placed the loan on a collection hold while this was attempted; then, when loss mitigation failed, SPS consulted a law firm to develop a litigation strategy to recover the property. Wilmington does not cite to any document in the record that details this process other than a declaration in support of its motion for summary judgment. Clerk's Papers at 866-67. The declaration is not supported by any other evidence.

9

Condo Group and Umpqua argue that CitiBank and its servicers' efforts to mitigate losses with Kevin Hoover from 2013 to early 2015 had nothing to do with the status of the property, and that CitiBank, as a deed of trust beneficiary, did nothing to assert its rights when notified of the sheriff's sale. They point to the 65 months that transpired between CitiBank becoming clearly aware of the sheriff's sale and Wilmington's December 2016 assertion of the right to foreclose. In support, they also point to an October 2012 communication between QLS and CitiBank that conveyed the position of Condo Group that the deed of trust security interest had been extinguished and a cease and desist letter from Condo Group to QLS that led to QLS's cancellation of a planned trustee's sale.

Further, they argue that communications between CitiBank's lawyers and Condo Group offering to buy the property from Condo Group showed that CitiBank recognized Condo Group as the property's rightful owner. They also assert that constructive notice was given by the recording of the statutory warranty deed in 2013. As for Wilmington's allegedly unreasonable delay in moving to foreclose after vacation of the default judgment, the record does not disclose precisely when or how Wilmington acquired CitiBank's interest in the property.[6]

The parties' appellate arguments demonstrate that the evidence before the trial court at the time of the motion for summary judgment supported

---

[6] With regard to the laches, equitable estoppel and bona fide purchaser issues, we list examples of competing inferences drawn by the parties. These lists are not exhaustive and other competing inferences may exist.

competing inferences.[7] Fact-finding is necessary to determine which inferences should properly be drawn and whether the facts, as found by a fact finder, support application of laches. The trial court erred by granting summary judgment when facts were in dispute.

IV

Condo Group and Umpqua next assert that the doctrine of equitable estoppel bars Wilmington's efforts to enforce its deed of trust. They assert that the trial court erred by dismissing this defense. As with laches, the evidence put forth by the parties gives rise to competing inferences that rendered summary judgment improper.

The elements of equitable estoppel are: (1) an act or omission by the first party; (2) an act by another party in reliance on the first party's act, and (3) an injury that would result to the relying party if the first party were not estopped from repudiating the original act. Kramarevcky v. Dep't of Soc. & Health Servs., 122 Wn.2d 738, 743, 863 P.2d 535 (1993). This doctrine is not favored and must be proved by clear, cogent, and convincing evidence. Robinson v. City of Seattle, 119 Wn.2d 34, 82, 830 P.2d 318 (1992). Moreover, our Supreme Court has explained that "mere silence or acquiescence will not operate to work an estoppel where the other party has constructive notice of public records which

---

[7] Wilmington also disputes the third element of laches, namely, that the third party defendants would be prejudiced by the late assertion of its foreclosure right, because the parties are covered by a title insurance policy. The applicability of relief does not turn on whether a party is insured. Alaska Pac. S. S. Co. v. Sperry Flour Co., 94 Wash. 227, 230, 162 P.26 (1917). Nor does Wilmington show that the availability of title insurance extends to cover the entire loss that the third party defendants would suffer were it to foreclose. Thus, there are also genuine issues of material fact regarding the third element of laches.

disclose the true facts." Waldrip, 40 Wn.2d at 476. "Where the parties have equal means of knowledge there can be no estoppel in favor of either." Waldrip, 40 Wn.2d at 476. "[V]ery clear and cogent evidence" is required "to estop an owner out of a legal title to real property." Tyree v. Gosa, 11 Wn.2d 572, 578, 119 P.2d 926 (1941).

The crux of the parties' dispute over the applicability of equitable estoppel is the second element: whether Condo Group, and later Lian and Umpqua, reasonably relied on CitiBank's actions and inaction in the wake of the default judgment.[8] To support its claim that Wilmington is equitably estopped from commencing its foreclosure proceeding, Condo Group points to Board of Regents of University of Washington v. City of Seattle, 108 Wn.2d 545, 553-54, 741 P.2d 11 (1987). That case dealt with a dispute over the City's easement over Fourth Avenue, which traversed property owned by the Board of Regents. In 1906, the City pursued a condemnation action and obtained a default judgment awarding it the easement over Fourth Avenue. In 1984, the Board belatedly challenged the condemnation due to a dispute over a pedestrian skybridge permit. Bd. of Regents, 108 Wn.2d at 549. Our Supreme Court rejected this challenge on the ground that the "State failed to challenge the original 1906 condemnation award while, with knowledge that the City depended upon the validity of that award, the City improved, graded, and regulated Fourth Avenue without challenge from the State." Bd. of Regents, 108 Wn.2d at 555.

---

[8] As with laches, Wilmington also avers that the existence of title insurance negates the third party defendants' assertion of potential monetary loss. For the reasons discussed above, we disregard this assertion.

12

Notwithstanding the notable difference between a delay of 75 years and a delay of 4 years, Condo Group asserts that it justifiably relied upon various of CitiBank's actions and inactions during the interval between the original foreclosure by the Association and the initiation of Wilmington's foreclosure proceeding. These actions or inactions include CitiBank's silence prior to the 2012 sheriff's sale, CitiBank's scheduling and cancellation of its own trustee's sale on its deed of trust, also in 2012, and CitiBank's attempt to purchase the property from Condo Group in 2013. Thus, Condo Group contends, CitiBank acknowledged that its security interest had been extinguished by the 2012 sheriff's sale.

Wilmington, however, asserts that none of these actions amounted to an acknowledgment that its security interest had been extinguished. Wilmington avers that communications between Condo Group and CitiBank were of a sporadic nature, that it had no part in the trustee's sale planning as it was a beneficiary and not a trustee of the trust, and that any other communications prior to CitiBank's motion to vacate were aimed at resolving the issue without waiving its rights.

Ultimately, again, while the parties do not dispute the underlying facts, the record gives rise to competing inferences as to the import of and rationale for CitiBank's actions and communications. Similarly, questions remain and competing inferences exist as to the degree of reliance that Condo Group placed upon CitiBank's behavior. Summary judgment dismissal of the equitable estoppel defense was improper.

13

V

Next, Umpqua asserts entitlement to bona fide purchaser protection. The bona fide purchaser doctrine provides that a good faith purchaser for value who is without actual, constructive, or inquiry notice of another's interest in real property has a superior interest in the property. Tomlinson v. Clarke, 118 Wn.2d 498, 500, 825 P.2d 706 (1992); see also Miebach v. Colasurdo, 102 Wn.2d 170, 175, 685 P.2d 1074 (1984) ("'A bona fide purchaser for value is one who without notice of another's claim of right to, or equity in, the property prior to his acquisition of title, has paid the vender a valuable consideration.'" (quoting Glaser v. Holdorf, 56 Wn.2d 204, 209, 352 P.2d 212 (1960))). The rule has also been applied to "bona fide mortgagors or [e]ncumbrancers as well as bona fide purchasers," bringing Umpqua within its purview. Miller v. Am. Savs. Bank & Trust Co., 119 Wash. 243, 247-48, 205 P. 388 (1922) (citing Geo. M. McDonald & Co. v. Johns, 62 Wash. 521, 522, 114 P. 175 (1911)).

"Good faith" "means [a subsequent purchaser] shall not have knowledge or notice of the other party's interest in some way outside the recording of the instrument that creates that interest." 18 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: TRANSACTIONS § 14.10 (2d ed. 2004). "The burden of establishing that a purchaser had prior notice of another's claimed right or equity rests upon the one who asserts such prior notice." Biles-Coleman Lumber Co. v. Lesamiz, 49 Wn.2d 436, 439, 302 P.2d 198 (1956).

A bona fide purchaser of an interest in land is entitled to rely on record title. Lind v. City of Bellingham, 139 Wash. 143, 147, 245 P. 925 (1926); Levien

14

v. Fiala, 79 Wn. App. 294, 299, 902 P.2d 170 (1995). The determination of a buyer's status as a bona fide purchaser is a mixed question of law and fact because what a purchaser knew is a factual question, but the legal significance of that knowledge is a legal question. Peoples Nat'l Bank of Wash. v. Birney's Enters., Inc., 54 Wn. App. 668, 674, 775 P.2d 466 (1989); Steward v. Good, 51 Wn. App. 509, 512, 754 P.2d 150 (1988).

A purchaser is on notice if he or she has knowledge of facts sufficient to put an ordinarily prudent person on inquiry and a reasonably diligent inquiry would lead to the discovery of title or sale defects. Steward, 51 Wn. App. at 513 (quoting Peterson v. Weist, 48 Wash. 339, 341, 93 P. 519 (1908)). A court must, therefore, determine whether events surrounding the property's sale created a duty on the subsequent purchaser's part to inquire into possible flaws in the foreclosure process. Albice v. Premier Mortg. Servs. of Wash., Inc., 157 Wn. App. 912, 929, 239 P.3d 1148 (2010), aff'd, 174 Wn.2d 560, 276 P.3d 1277 (2012).

A major factor in determining whether the purchaser had inquiry notice is the purchaser's real estate investment experience. Miebach, 102 Wn.2d at 176 (purchaser with 23 years of investment experience was not bona fide purchaser). Another factor is the price paid for a property. It is not unusual for a foreclosure proceeding to result in a property being sold for less than its fair market value. Albice, 157 Wn. App. at 931. However, an inadequate purchase price may be a factor that puts a purchaser on notice of another party's claim of right to, or equity in, the property. See Casa del Rey v. Hart, 110 Wn.2d 65, 72, 750 P.2d 261

15

(1988); Miebach, 102 Wn.2d at 176-77. While there is no set standard for determining an inadequate purchase price,

> Generally, however, a court is warranted in invalidating a sale where the price is less than 20 percent of fair market value and, absent other foreclosure defects, is usually not warranted in invalidating a sale that yields in excess of that amount. . . . While the trial court's judgment in matters of price adequacy is entitled to considerable deference, in extreme cases a price may be so low (typically well under 20% of fair market value) that it would be an abuse of discretion for the court to refuse to invalidate it.

RESTATEMENT (THIRD) OF PROP.: MORTGAGES § 8.3 cmt. b (AM. LAW INST. 1997).

In this case, Condo Group purchased the property at the sheriff's sale for $20,100, at a time when the condominium was valued at $277,000. Thus, the purchase price was approximately 7.3 percent of the property's fair market value. Thus, the recorded history of the property, which showed the extinguishment of CitiBank's security interest, weighs in favor of bona fide purchaser status. The purchase price, however, could give rise to a different inference.

That the foreclosure sale was the result of a judicial foreclosure action is also of significance. A search of the court file by Lian would have revealed that CitiBank was a named defendant in a judicial action, that CitiBank had been served with process, that CitiBank had not challenged the sufficiency of the service, that the superior court judge had treated the service as sufficient, and the entry of a judgment and decree against CitiBank extinguishing its interest.[9] These facts give rise to inferences of benefit to Lian and Umpqua. That

---

[9] A buyer might reasonably conclude that a judicial foreclosure action is more likely to be absent injustice or mistake than would be a nonjudicial foreclosure action.

Wilmington contends that other facts might negate or overcome these inferences is of no moment on summary judgment.

Finally, there is a lack of evidence in the record as to what real estate investment experience, if any, Lian had at the time he purchased the property. Indeed, there is no indication of what business experience Lian accrued during his life or what knowledge he had of the condominium in question.[10] If Lian was experienced, inferences beneficial to Wilmington could be drawn. The contrary would be the case were he inexperienced. On remand, evidence can be adduced better completing the picture.[11] As the evidence now stands, trial court fact-finding is necessary. Summary judgment was improper.

---

[10] There is also a dispute as to whether the existence of an unreleased deed of trust, recorded prior to the Association's foreclosure judgment, would be sufficient to put Lian and Umpqua on inquiry notice. Judicial foreclosure of a senior mortgage, if valid, extinguishes all junior interests whose holders were named as defendants. Worden v. Smith, 178 Wn. App. 309, 319-20, 314 P.3d 1125 (2013) (citing U.S. Bank of Wash. v. Hursey, 116 Wn.2d 522, 526, 806 P.2d 245 (1991)). Our courts have recognized that the bona fide purchaser rule protects a purchaser who acquires property at a judicial sale, but was not a party to the action giving rise to the sale, even if the judgment is subsequently overturned on appeal. Grand Inv. Co. v. Savage, 49 Wn. App. 364, 368-69, 742 P.2d 1262 (1987) (citing Prince v. Mottman, 84 Wash. 287, 295, 146 P. 841 (1915)). In this case, the judgment was simply vacated after Condo Group, and Lian, took title to the property. Whether these parties were aware that the default judgment herein was subject to vacation, and when such knowledge arose, is, again, a question of fact precluding summary judgment.

[11] Umpqua also asserts that CitiBank and Wilmington's period of silence amounted to a waiver of its claims against it. Unlike its other equitable defenses, Umpqua cannot show that a genuine issue of material fact precluded dismissal of this defense on summary judgment.

"Waiver is an equitable principle that can apply to defeat someone's legal rights where the facts support an argument that the party relinquished their rights by delaying in asserting or failing to assert an otherwise available adequate remedy." Albice, 174 Wn.2d at 569. Waiver must be shown by substantial evidence of unequivocal acts or conduct showing intent to waive, "and the conduct must also be inconsistent with any intention other than to waive." Mid-Town Ltd. P'ship v. Preston, 69 Wn. App. 227, 233, 848 P.2d 1268 (1993).

The evidence relied upon by Lian and Umpqua in asserting that Wilmington or CitiBank waived its security interest does not point to any actions by Wilmington or CitiBank that show an intent to waive the security interest. Their conduct is not plainly inconsistent with any other intention besides walking away from the deed of trust. The doctrine of waiver is not applicable. The defense was properly dismissed.

VI

Next, we turn to Wilmington's unjust enrichment claim. At trial, this claim was dismissed as moot. Wilmington does not challenge this dismissal, but seeks to reserve its claim of unjust enrichment as an alternative remedy in the event we reverse the foreclosure decree and deny it the benefit of the deed of trust. Because we remand this case for further proceedings, the claim should be reinstated.

VII

After granting Wilmington's motion for summary judgment, the trial court issued a supplemental judgment awarding to Wilmington $33,238.99 in attorney fees and costs. Given our resolution of the issues herein, that award must be vacated. Any award of trial or appellate attorney fees must await the identification of a substantially prevailing party.

Affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion.

_____
Dwyer, J.

WE CONCUR:

_____          _____
Mann, A.C.J.                      Appelwick, C.J.

18